GARY W. BOISSEAU          **PLAINTIFF**

VS.           **CIVIL ACTION NO. 3:14cv149**

TOWN OF WALLS, MISSISSIPPI,
RAY DENISON and PATTI DENISON      **DEFENDANTS**

## ORDER

 This cause comes before the court on defendants' motion for summary judgment, pursuant to Fᴇᴅ. R. Cɪᴠ. P. 56. Plaintiff has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, concludes that it should be granted as to plaintiff's sole federal claim and that the court should decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims.

## FACTS

 This is a wrongful termination case, based upon both federal and state law, in which the parties' versions of why the plaintiff was not rehired differ greatly. The parties do agree that plaintiff was hired as the Walls police chief in January 2010 and that, in July 2013, the town's board of aldermen voted not to re-appoint him to that position. That aside, the parties' versions of the facts of this case differ significantly. Defendants characterize plaintiff as a dishonest and erratic man who lied about his certification to obtain and retain his position, committed various misconduct during his tenure, and engaged in a sustained campaign of harassment against town employees after he lost his job. Defendants devote several pages of their brief to the evidence which, they claim, supports this characterization of plaintiff. In the opening paragraph of their

summary judgment brief, for example, defendants write that:

> Plaintiff Gary Boisseau is an imposter. To obtain the position as police chief with Defendant the Town of Walls, Mississippi, he lied on his employment application about being certified to work as a full-time law enforcement officer. Then, during his tenure as police chief, he submitted false documentation to both the Mississippi Office of Standards and Training and the Mississippi Highway Patrol. The deception continued throughout this litigation, as Bossieau repeatedly perjured himself at his deposition and sent harassing correspondence under fake names to town employees.

[Defendants' brief at 1].

Plaintiff disputes defendants' unflattering characterizations of him to varying degrees. Plaintiff admits that he failed to pass the full-time certification tests at the law enforcement academy he attended, but he maintained at his deposition, without supporting proof either then or since, that he obtained certification through "street" training. In his deposition, plaintiff initially denied that he had sent certain harassing e-mails using fake names, but, in his response to the summary judgment motion, he now admits that he sent a "number of bizarre emails to city officials" using fake names. In his brief, plaintiff seeks to turn some of these acts of harassment against defendants, citing the testimony of his psychiatrist regarding "how depression resulting from losing one's job could result in a loss of judgment, causing a person to do things that he would not ordinarily do." In this vein, plaintiff similarly cites the testimony of his wife that he is not "the same man he was before Patti and Ray Denison did what they did to him. My husband is broken and I will never get him back. He is completely changed." [Plaintiff's brief at 6].

Defendants contend that the board's decision not to re-appoint plaintiff in July 2013 came about as a result of issues involving e-mails, but of a different sort. Specifically, defendants assert that when plaintiff, apparently a rather computer-saavy individual, was asked to delete e-mails of the outgoing mayor, he improperly read one of them relating to him:

Boisseau is a self-proclaimed "tech wiz" and alleges that, prior to Mayor Denison taking office, Mayor Austin asked him to delete all e-mails from the mayoral computer so that Mayor Denison could begin with a fresh slate. As he was deleting the e-mails, Boisseau claims to have noticed one that had been sent from City Clerk Kathy Gordon, on June 27, 2013, that included his name in the subject line and a complaint about him in the body of the message. Boisseau opened the e-mail, read it, printed it off, and took it to Mayor Denison on her first day as the new mayor because he wanted "to nip [the issue] in the bud." It is undisputed that Mayor Austin did not give Boisseau permission to read the content of any of her e-mails when she asked him to delete all of them.

[Defendants' brief at 4].

In their brief, defendants emphasize that the board voted not to re-appoint plaintiff very shortly after this incident and that his reading of the e-mail was discussed at the meeting where the decision was made:

The first meeting of the newly elected mayor and board of aldermen was held on July 2, 2013. During the meeting, the mayor and board went into executive session to discuss reappointments but ended up tabling them until a subsequent meeting. On July 9, 2013, the mayor and board reconvened and again went into executive session to discuss re-appointments. Following discussion about Boisseau accessing the content of a mayoral e-mail without authorization, the board voted four-to-zero not to re-appoint Boisseau as police chief.

[Defendants' brief at 4]. For his part, plaintiff does not deny that he read the e-mail in question, but he argues that, in light of his overall record as police chief, the incident did not warrant termination. Specifically, plaintiff writes that:

[T]here is evidence from two (2) subordinates that Boisseau was an outstanding performer. Defendants fired Boisseau even though he was the only qualified operator of the NCIC, thus precluding the Defendant Town from being able to check criminal histories after he was gone. The former mayor, who was the alleged victim of the invasion of privacy by the reading of her email (Lynda Austin), testified that she did not have any problem with his coming into her office and helping with the computer issues, and, furthermore, that she would not have recommended the termination of Boisseau if she had been the mayor. That Boisseau did not think there was anything wrong with his reading the email, when Mayor Austin had asked him to clear out her email account, is obvious from the fact that it was Boisseau himself who went to Defendant/Mayor Patti Denison to

complain about the email.

[Plaintiff's brief at 13].

Plaintiff contends that the real reason for his firing was that he rebuffed pressure from Ray and Patti Denison, who served as alderman and mayor respectively, to make a DUI arrest against their friend Charles Pryor "go away." Plaintiff notes that "Pryor has been hired to do construction work many times by Defendant Ray Denison and has known Defendant Patti Denison as long as he has known Defendant Ray Denison," and he asserts that this relationship led the Denisons to intervene on his behalf. In his brief, plaintiff describes the pressure he allegedly received from the Denisons as follows:

> According to Boisseau, both Defendants Ray and Patti Denison asked him to "do something with the [D.U.I.] charge" that Strickland had made against Pryor. Boisseau responded that he could not dismiss the charge because Pryor is a danger to the public. In fact, Boisseau said he did not have the authority, as police chief, to dismiss the charge, although he did have the authority to go to the prosecutor and ask for a lesser charge. Boisseau was not willing to do that. Pryor was ultimately convicted on the D.U.I. charge. After Pryor's conviction, Defendant Mayor Patti Denison spoke to Boisseau about Pryor's conviction, and said that she "couldn't believe something couldn't be done about it."

[Plaintiff's brief at 5].

For their part, defendants provide a much more benign description of the Denisons' actions, which they characterize as simple inquiries regarding the punishment that Pryor might be facing. Defendants describe these alleged inquiries as follows:

> Less than a month after the incident, one of Boisseau's subordinate officers (and Boisseau's current employer), Mike Strickland, arrested Pryor for driving under the influence. Pryor's wife, Linda Pryor, subsequently called Alderman Ray Denison and asked if he could find out what type of punishment Pryor was facing. In turn, Alderman Dennison called Boisseau and attempted to call Walls' Prosecutor Stan Little. Alderman Denison was unable to reach Little and instead only spoke with Little's paralegal, who happens to be Boisseau's wife. Pryor ultimately was convicted of DUI second in February 2013.

4

[Defendants' brief at 3].

In response, plaintiff argues that he refused to intervene on Pryor's behalf because of his desire to follow the law and protect the public from a known drunk. Defendants deny that there was even a request made for plaintiff to intervene, but they argue that Pryor was a personal enemy of plaintiff's, and they appear to imply that it was the bad blood between the two men, rather than any public concerns, which led plaintiff to want to see him convicted. In his brief, plaintiff agrees that there was a history of conflicts between him and Pryor, who was actually his landlord. Plaintiff describes a December 2012 confrontation between himself and Pryor as follows:

> In December 2012, Pryor came to the house that Boisseau was renting from Pryor at about 12:30 in the morning; Pryor was drunk and beating on the door. Pryor accused Boisseau's dog of having knocked over his trash, a charge which according to Boisseau was impossible, since his dog had an electric collar. Boisseau became furious with Pryor and while he does not remember saying it, it may be that he said, "I got your number. I got a D.U.I. on you. You're going down." The incident did make him furious. By telling Pryor that "you're going down," Boisseau meant that he was going to jail. Boisseau could not arrest Pryor, since the house he was renting from Pryor was not within the city limits. Boisseau, therefore, called the sheriff's department. Boisseau reported that his wife was "terrified" and Boisseau "had no idea at what [Pryor] was going to do."

[Plaintiff's brief at 4-5].

Having discussed the parties' very different version of the facts of this case, the court now turns to the law.

## DISCUSSION

### I. Is the First Amendment retaliation cause of action applicable in this case?

In this case, there is but one federal claim asserted by plaintiff: a First Amendment retaliation claim. In the Fifth Circuit, a First Amendment retaliation claim involving a public

employee requires a showing that (1) the plaintiff suffered an adverse employment decision, (2) the plaintiff's speech involved a matter of public concern, (3) the plaintiff's interest in speaking outweighed the governmental defendant's interest in promoting efficiency, and (4) the protected speech motivated the defendant's conduct. *Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2004) (en banc). The Fifth Circuit's reference to whether the protected speech "motivated" the defendant's conduct highlights the fact that U.S. Supreme Court precedent allows plaintiffs to exercise the "mixed motive" option in First Amendment retaliation cases. *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). Under this mixed-motive option, the plaintiff need only demonstrate that his speech was one factor among others motivating the defendant's conduct, and, if such a showing is made, it falls to the latter to demonstrate that it would have made the same decision even absent retaliation. *Id.*

It should be apparent from the foregoing discussion that there are very large differences between the versions of the facts of this case set forth by plaintiff and defendants. While there is clearly a great deal of unflattering evidence against plaintiff in this case, this court emphasizes that, at the summary judgment stage, it is required to view the facts in the light most favorable to him, as the non-moving party. Plaintiff has submitted his sworn testimony that the Denisons did, in fact, seek to intervene on Pryor's behalf, and the notion that they might have taken exception to plaintiff's refusal to do so does not strike this court as being an implausible one. On the other hand, defendants note that the actual decision to fire plaintiff was not made by the Denisons alone, but required the vote of certain newly-elected board members who had no apparent concerns regarding Pryor's prosecution.

In light of the foregoing, if this were a case where a First Amendment retaliation claim were applicable, then this court would likely have a difficult call to make regarding whether fact issues existed with regard to it. In the court's view, however, the First Amendment retaliation cause of action is simply not applicable in this case. In so concluding, the court emphasizes that, in twenty-two pages of briefing, plaintiff fails to cite a single decision in which a federal court applied the First Amendment retaliation cause of action to a refusal by a public official to engage in unlawful or unethical conduct. Moreover, plaintiff cites state, rather than federal, authority in support of his assertion that the decision to terminate him was unlawful. This is consistent with the fact that (aside from limited exceptions inapplicable here) determining whether a termination for refusing to participate in wrongful or illegal conduct violates public policy has been a subject left to the states to decide.

Cases involving plaintiffs who allege that they were fired for refusing to engage in such conduct have been the subject of frequent consideration by state courts. As noted in the introduction to an ALR article on this subject:

> Courts frequently find that the public policy of a state mandates that an employee may not be terminated for refusing to perform or participate in illegal or wrongful acts. This public policy exception was applied in *Lins v. Children's Discovery Centers of America, Inc.*, 95 Wash. App. 486, (Div. 2 1999), where an employee was terminated for refusing to discharge fellow employees who had filed workers' compensation claims. The court found that such discharges would have been in violation of a state statute and that public policy prevents an employer from retaliating for an employee's refusal to carry out a clearly unlawful order. Other cases have reached contrary results depending on the circumstances presented and the varying rules applied by the courts, as the following annotation illustrates.

Common–Law Retaliatory Discharge of Employee for Refusing to Perform or Participate in Unlawful or Wrongful Acts, 104 A.L.R.5th 1 (2002). Indeed, plaintiff has asserted such a public policy-based claim under Mississippi law in this case, and it is therefore clear that he himself

maintains that there exists a state law vehicle for him to obtain recovery in this case. Plaintiff's

failure to cite any federal law supporting his First Amendment retaliation claim is particularly

glaring in light of the fact that he faces a qualified immunity defense in this case, which this

court discusses below. Such a defense, once raised, requires the plaintiff to "put his legal cards

on the table" and demonstrate that the defendants' actions were contrary to clearly established

federal law.

Plaintiff's lack of authority aside, this court concludes that defendants have affirmatively

established in their own briefing that no First Amendment retaliation cause of action may be

maintained in this case. In arguing that the First Amendment retaliation cause of action is

inapplicable here, defendants rely primarily upon the U.S. Supreme Court's decision in *Garcetti*

*v. Ceballos*, 547 U.S. 410, 421 (2006), which held that there is no First Amendment protection at

all when public employees make statements as part of their official duties. The Fifth Circuit has

observed in this context that:

> To determine whether the public employee's speech is entitled to protection,
> courts must engage in a two-step inquiry. The first step requires determining
> whether the employee spoke as a citizen on a matter of public concern. If the
> employee has spoken as a citizen on a matter of public concern, then a First
> Amendment claim may arise. The second step of the inquiry requires determining
> "whether the relevant government entity had an adequate justification for treating
> the employee differently from any other member of the general public."

*Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 736 (5th Cir. 2015)(citations omitted).

Based upon this authority, defendants argue in their brief that:

> [the law] requires an employee to have spoken "as a citizen" – as opposed
> to as an employee – on a matter of public concern. *Gibson v. Kilpatrick*, 773 F.3d
> 661, 667 (5th Cir. 2014). "[T]he 'as a citizen' requirement draws a distinction
> between when public employees speak in their private capacities and when they
> speak 'pursuant to their official duties.'" *Id*. (quoting *Garcetti v. Ceballos*, 547
> U.S. 410, 421 (2006)). A public employee does not speak as a citizen, and

therefore his or her speech is not constitutionally protected, when the speech is made pursuant to the employee's ordinary job duties. *Id*. at 667-68 (examining *Garcetti* and *Lane v. Franks*, 134 S.Ct. 2369 (2014)).

Boisseau made clear at his deposition that his actions with respect to Charles Pryor were taken pursuant to his ordinary job responsibilities. Specifically, he testified that his ordinary job duties as police chief included supervising other officers, preventing crime, detecting crime, apprehending people who commit crimes, gathering evidence, making recommendations on whether individuals should be prosecuted, and testifying in court. Boisseau's testimony means that he was acting in his capacity as a public employee, rather than a citizen, with respect to his alleged communications with Mayor Denison and Alderman Denison concerning Charles Pryor's DUI charge. *Id*. As such, the First Amendment claim may be dismissed because Boisseau did not engage in any constitutionally protected conduct.

[Defendant's brief at 17].

While the court agrees with defendants that any speech by plaintiff in this case occurred as part of his official duties, it will address an additional issue first: whether the actions for which plaintiff claims to have been terminated in this case constituted "speech" at all.[1]   In this court's experience, First Amendment retaliation cases generally involve a plaintiff pointing to specific communications he made which allegedly resulted in his termination.  In this case, by contrast, plaintiff alleges that he was fired for his *actions* in refusing to "fix" Pryor's DUI charge.  This is a very different type of First Amendment retaliation claim than this court typically sees, and it appears to be quite atypical among Fifth Circuit cases as well.

This court conducted a Westlaw search which revealed eight First Amendment retaliation

---

[1]     The court notes that defendants devoted the greater portion of their briefing to the "side issues" discussed in section two of this opinion, which they believe to be dispositive in this case. As discussed below, however, this court prefers to decide this case on the basis of the applicable First Amendment standards, and it will accordingly delve into the First Amendment issues in greater detail than defendants did in their briefing, which was necessarily limited by length restrictions.

cases decided so far this year in this circuit, in which *Garcetti* was cited. While the results in these cases varied, all but one of them involved an identifiable statement or communication which, the plaintiff asserted, enjoyed First Amendment protection. *See Hardesty v. Cochran*, 2015 WL 4237656, at *2 (5th Cir. July 14, 2015)(plant manager for a water district informed district's customers about a planned annexation); *Culbertson v. Lykos*, 790 F.3d 608, 614 (5th Cir. 2015)(police technicians reported concerns about the reliability of Breath Alcohol Testing ("BAT") vans to police department supervisors); *Wilson v. Tregre,* 787 F.3d 322, 324 (5th Cir. 2015)(sheriff's deputy reported his concerns about the legality of videotaping practices in the department's interrogation rooms); *Paske v. Fitzgerald*, 785 F.3d 977, 981 (5th Cir. 2015)(police sergeant spoke up at a departmental meeting to question certain department practices); *Farquhar v. Steen*, 611 F. App'x 796, 799 (5th Cir. 2015)(employee fired for using a phrase which was allegedly racially derogatory claimed that his statement was protected by the First Amendment); *Benes v. Puckett*, 602 F. App'x 589, 590 (5th Cir. 2015) (city employee emailed the members of the city council, alleging misuse of public funds); *Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 733 (5th Cir. 2015)(police sergeant posted statements critical of her superior officer to the Mayor's public Facebook page).

The one arguable exception is *Phillips v. City of Dallas*, 781 F.3d 772, 774 (5th Cir. 2015), where an employee who was fired after announcing his candidacy for political office claimed his activities were protected by the First Amendment. Like this case, *Phillips* involved an act rather than a verbal statement, namely the act of running for political office. However, running for office strikes this court as having far clearer First Amendment implications than plaintiff's actions in this case. That being the case, the court deems it significant that the Fifth

Circuit in *Phillips* acknowledged that it had previously hedged on the issue of whether running for political office enjoys First Amendment protection. *See James v. Texas Collin Cnty.*, 535 F.3d 365, 377 (5th Cir. 2008) ("[i]t is unclear that the First Amendment provides a right to run for office that extends generally to government employees.") Indeed, some federal circuits maintain even today that the First Amendment does not extend to political candidacy alone, *see Greenwell v. Parsley*, 541 F.3d 401, 404 (6th Cir. 2008), although the Fifth Circuit held in *Phillips* that it does.

The issue in this case is not, of course, the First Amendment protection enjoyed by candidates for public office, though the court nevertheless deems the law in that context to be relevant here. In the court's view, the fact that federal appellate courts have hedged and differed on the constitutional protections relating to an act with far more obvious First Amendment implications than plaintiff's actions in this case highlights the fact that federal courts will not allow the protections of the First Amendment to be lightly claimed. This is consistent with the First Amendment's status as one of the Constitution's most cherished protections, rather than a vague "catch all" provision covering a variety of conduct, as plaintiff seeks to use it in this case.

As noted previously, plaintiff alleges in his brief that his refusal to "fix" Pryor's DUI was accompanied by statements he made, specifically the following:

> According to Boisseau, both Defendants Ray and Patti Denison asked him to "do something with the [D.U.I.] charge" that Strickland had made against Pryor. Boisseau responded that he could not dismiss the charge because Pryor is a danger to the public. In fact, Boisseau said he did not have the authority, as police chief, to dismiss the charge, although he did have the authority to go to the prosecutor and ask for a lesser charge. Boisseau was not willing to do that.

This court wishes to be clear that it is not holding that plaintiff's statements quoted above do not constitute speech. Rather, this court is holding that, under plaintiff's own version of the facts of

this case, he was not terminated on the basis of any such speech, since it was merely incidental to the actions which he claims motivated his termination. In the court's view, the strongest indication that its conclusion in this regard is correct is plaintiff's complete failure to cite any case law applying the First Amendment retaliation cause of action to refusals by employees to participate in wrongful or illegal activity. Such refusals are inevitably accompanied by speech of some sort, and, if plaintiff were correct that this fact renders the refusals themselves "speech," then he should have been able to cite a wealth of First Amendment case law on point, since this is a factual scenario which has been dealt with extensively by courts. He has failed to do so.

The simple fact is that we live in a world made up of individuals who generally have the ability to speak and who routinely use that ability to explain any actions they might take. By the same token, individuals use that same ability when they request that certain action be taken. As such, if all that were required in this context was a plaintiff being able to point to words that came out of an individual's mouth in the course of taking a particular action, then a vast number of cases would suddenly become First Amendment cases. This is a retaliation case, and, as quoted above, plaintiff maintains that "Ray and Patti Denison asked him to 'do something with the [D.U.I.] charge.'" Thus, plaintiff himself acknowledges that the Denisons were interested in his actions, not his words, and the mere fact that he inevitably used the medium of speech to communicate his refusal to take that action does not transform this into a First Amendment case. This is, rather, a fairly prototypical case for determining whether Mississippi's public policy against terminating an employee for refusing to participate in wrongful or illegal conduct was violated, and plaintiff should have asked state courts to decide this issue, since diversity jurisdiction is clearly lacking.

Even a cursory review of the Fifth Circuit's opinions in this context make it clear that a plaintiff must do far more than make boilerplate assertions that he engaged in First Amendment-protected activity.  In *James*, for example, the Fifth Circuit wrote that:

> James asserts that he suffered an adverse employment action, his termination, because he exercised his First Amendment rights on two separate occasions.  The first was his June 19, 2003 letter reporting Kleinheksel for various inappropriate conduct.  The second was his 2004 campaign for the Republican nomination for Collin County Commissioner.  We will analyze each separately.

*James*, 535 F.3d at 376.  Thus, the Fifth Circuit has required that plaintiffs state specifically what activity they engaged in that enjoys First Amendment protection, and it has carefully scrutinized their allegations in this regard.   In his briefing in this case, plaintiff clearly alleges that it was his act of refusing to "fix" the DUI charge, rather than any statements made in conjunction with same, which led to his termination.  Thus, plaintiff contends that he was terminated for his conduct, and he appears to simply assume that his actions in this regard constituted First Amendment-protected activity.  This court finds this assumption to be erroneous.

While the U.S. Supreme Court has held that the protections of the First Amendment may extend to certain physical acts, it has stressed that it will only do so if they are "sufficiently imbued with elements of communication" to warrant that protection.  In *Texas v. Johnson*, 491 U.S. 397, 403, 109 S. Ct. 2533, 2538 (1989), a "flag burning" case, the U.S. Supreme court emphasized that, prior to considering the requirements of the First Amendment "[w]e must first determine whether Johnson's burning of the flag constituted expressive conduct, permitting him to invoke the First Amendment in challenging his conviction."

In analyzing whether the burning of a flag constituted "speech," the Supreme Court wrote in *Johnson* that:

The First Amendment literally forbids the abridgment only of "speech," but we have long recognized that its protection does not end at the spoken or written word. While we have rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea,", we have acknowledged that conduct may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments."

In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it."  Hence, we have recognized the expressive nature of students' wearing of black armbands to protest American military involvement in Vietnam, of a sit-in by blacks in a "whites only" area to protest segregation, of the wearing of American military uniforms in a dramatic presentation criticizing American involvement in Vietnam, and of picketing about a wide variety of causes.

*Johnson*, 491 U.S. at 404 (citations omitted).

Based upon this authority, this court concludes that plaintiff's actions in refusing to "fix" a DUI arrest can not reasonably be regarded as acts "sufficiently imbued with elements of communication" to warrant protection by the First Amendment.  Indeed, plaintiff's rather ministerial act of simply doing his job stands in sharp contrast to the communicative acts cited by the Supreme Court in *Johnson*, such as wearing black armbands to protest the Vietnam War. *See* *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). Moreover, while plaintiff may argue that his refusal to fix the DUI charge communicated a message to the Denisons that "it is wrong to violate the law," or something to that effect, his actions in this regard involved nothing more than him doing the job he was paid to do and obeying the laws he was obligated to obey.  Indeed, it seems clear that laws, by their very nature, regulate conduct in such a mandatory manner that an employee can not reasonably be characterized as having engaged in personal expression by following them.  Accordingly,

plaintiff is entitled to no special First Amendment protection for simply doing his job in the manner required by law.

The First Amendment's guarantee of free speech is designed to protect expression; its mandate is not to combat all manners of societal ills. The fact that the First Amendment does not apply in this context is clear enough from the fact that, as discussed previously, states throughout the country have developed public policy-based exceptions to the employment-at-will doctrine which prohibit terminating an employee for refusing to engage in wrongful or unlawful conduct. In the court's view, these public policy considerations are extremely important ones, but they have nothing to do with the First Amendment's protection of free speech, at least in the typical case. It thus seems clear that plaintiff should not have chosen to couch his claims in terms of the First Amendment at all, and he should have filed his state law claims in the Mississippi state courts which, unlike federal courts, have the authority to establish the state's public policy in this context.

In light of the foregoing, the court concludes that plaintiff was not terminated on the basis of any First Amendment-protected activity in this case, and it is, strictly speaking, unnecessary for it to address whether any alleged "speech" by plaintiff was made in the course of his public duties within the meaning of *Garcetti*. Nevertheless, this court finds that the answer to this question is clearly "yes" and that plaintiff's First Amendment claim is therefore barred for this additional reason.

In arguing that *Garcetti*'s bar is inapplicable, plaintiff maintains that the act of fixing a DUI charge would have been outside the scope of his job duties. Specifically, plaintiff argues in his brief that:

In this case, in refusing to "fix" the D.U.I. charge, Boisseau was not doing any act that he was "paid to perform." It was not part of his ordinary job duties to dismiss charges against persons who had committed dangerous offenses because public officials wanted those charges dismissed.

*Lane* noted: "The content of Lane's testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern." *Lane*, 134 S.Ct. at 2380. Similarly, Boisseau's refusal to obstruct justice by taking care of a felony because a public official wanted it dismissed is a matter of public concern. "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S.Ct. at 2379. While investigating and assisting in the prosecution of crime is certainly among the duties of a police officer, to fix a serious D.U.I. is not "ordinarily within the scope of an employee's duties, . . ." *Id.*

[Plaintiff's brief at 11].

This argument misses the point. Plaintiff's theory of this case is not that he was fired because he fixed a DUI charge, but because he *refused to do so.* In other words, plaintiff claims that he was fired because he performed his job correctly. As stated previously, this court concludes that simply performing one's job duties in the manner required by law does not constitute "speech" at all. Nevertheless, if this court were to assume otherwise, then plaintiff's "speech" at issue in this case clearly fell within his job duties based on the law set forth in *Garcetti*. Indeed, it is difficult to imagine what could be considered speech more integral to one's job duties that stating, in effect, "I will perform my official duties in the manner required by law."

Plaintiff relies upon the U.S. Supreme Court recent decision in *Lane v. Franks*, which held that the First Amendment may still apply when employees make statements relating to their public employment, since the question "is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." 134 S. Ct. 2369,

2379, 189 L. Ed. 2d 312 (2014).  Thus, in *Lane*, the Supreme Court held that an employee's testimony at a public trial constituted "citizen speech" even though the content of that testimony related to corruption at his workplace.  *Lane*, 134 S. Ct. at 2373.

In the court's view, a comparison of the facts of *Lane* and the instant case merely demonstrates that any alleged speech by plaintiff occurred in the course of his official duties.  In concluding that the trial testimony at issue in *Lane* constituted citizen speech, the Supreme Court emphasized that the obligation to testify truthfully at trials was one borne by all citizens:

> Truthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment. . . . Sworn testimony in judicial proceedings is a quintessential example of speech as a citizen for a simple reason: Anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth.

*Id.* at 2378.

In this case, plaintiff alleges that his actions, not testimony or words, led to his termination, and *Lane* thus strengthens this court's previously-stated conclusion that plaintiff was not terminated for any First Amendment protected "speech" in this case.  That issue aside, it is clear that any arguable "speech" in this case occurred in the course of plaintiff simply doing his job of enforcing the law equally towards all citizens.  It is difficult for this court to imagine what conduct could be more integral to a police chief's job.  Moreover, the pressure which plaintiff alleges he received from the Denisons to make the charges against Pryor "go away" only came about, under his theory of the case, because they believed that he had the power vested in him by his position as police chief to accomplish such.  Furthermore, the *Lane* analogy is clearly inapplicable here, since any communications between plaintiff and the Denisons

occurred not at a public trial or public proceedings, but rather in private conversations between them.

In light of the foregoing, the court concludes that there was no First Amendment violation in this case and that plaintiff's federal claims are due to be dismissed against all defendants. Out of an abundance of caution, however, the court will alternatively discuss the qualified immunity defense raised by the two individual defendants in this case, the Denisons. This defense places additional obstacles before plaintiff, above and beyond requiring that a constitutional violation be shown. The Fifth Circuit has described the basic qualified immunity standard as follows:

> "This court applies a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. First, we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights." If the evidence viewed in the light most favorable to Appellees demonstrates that a constitutional violation occurred, "we next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question."

*Johnson*, 565 Fed. Appx. at 290, *citing Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir. 2007). This court has previously concluded that the first part of the qualified immunity test has not been met in this case, since it has found that plaintiff was not fired on the basis of any First Amendment-protected activity in this case. In the event that the Fifth Circuit disagrees with this court's conclusion in this regard, however, the second part of the qualified immunity doctrine will still be relevant as to the Denisons, and this court will accordingly address it.

Part of the power of the qualified immunity doctrine arises from the fact that it must simply be raised as a defense by a defendant, and the plaintiff has the burden of establishing the proof and arguments necessary to overcome it. *See Pierce v. Smith*, 117 F.3d 866, 871–72 (5th

18

Cir. 1997) (noting that the plaintiff bears the burden of demonstrating that an individual defendant is *not* entitled to qualified immunity).   Once again, plaintiff's burden in this regard includes an obligation to demonstrate that the defendants violated "clearly established law" at the time of the conduct in question.  The U.S. Supreme Court has made it clear just how heavy a burden this may be.

In *Plumhoff v. Rickard,* 134 S. Ct. 2012 (2014), the Supreme Court recently emphasized that:

> An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was " 'clearly established' " at the time of the challenged conduct.  *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011).  And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Id.*, at 2083–2084. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." *Ibid.* In addition, "[w]e have repeatedly told courts ... not to define clearly established law at a high level of generality," *id.*, at 2074, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

*Plumhoff,* 134 S. Ct. at 2023.  Thus, the U.S. Supreme Court has stressed that plaintiffs' burden of demonstrating that defendants violated "clearly established law" requires not a citation to generalized principles of law, but, rather, specific authority on point which "placed the statutory or constitutional question" confronted by the official "beyond debate." *Id.*  Moreover, the Supreme Court has very recently indicated that, to demonstrate that the law in this regard was "clearly established," the plaintiff must be able to cite either a decision from that Court or a "robust consensus of cases of persuasive authority in the Courts of Appeals." *Taylor v. Barkes*, 135 S. Ct. 2042 (2015), *citing City and County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1778 (2015).

In light of the foregoing, it is a fatal weakness of plaintiff's case that, in response to the qualified immunity defense, he cites the following authority in support of his claims:

> Defendants claim there was no "statutory or constitutional right that was clearly established at the time of the challenged conduct." Defendants' Memorandum in Support of Summary Judgment, p. 18. [68]. Defendants make this claim in the face of MISS. CODE ANN. § 97-9-127(1) which states:
> (1) A person commits the offense of retaliation if he intentionally or knowingly harms or threatens to harm another by any unlawful act in retaliation for anything lawfully done in the capacity of public servant, witness, prospective witness or informant.
> (2) Retaliation is a Class 2 felony. Furthermore, MISS. CODE ANN. § 97-9-55 makes it a crime "to obstruct or impede the administration of justice in any court," and subjects whomever does so to two (2) years' imprisonment.

[Plaintiff's brief at 15].

Thus, plaintiff cites state, not federal law, in response to defendant's qualified immunity defense, and the court views this as being close to a concession of that defense. In so concluding, the court emphasizes that qualified immunity is only a defense to *federal*, not state claims. As such, the grant of qualified immunity in this order will have no effect upon any state law claims plaintiff might wish to assert against the Denisons. The "flip side" of this fact is that it is incumbent upon plaintiff, in response to the Denisons' qualified immunity motion, to establish a clear *federal* law basis for his sole federal claim: his First Amendment retaliation claim. Moreover, while it is possible that state law authority might inform a court's consideration of federal law issues in certain cases, there is no apparent connection between the state authority relied upon by plaintiff and the First Amendment. Indeed, the court seriously doubts that a plaintiff could ever prevail based *solely* upon state law as his basis for his argument that the U.S. Constitution was violated, and certainly not a statute having nothing to do with the

amendment at issue.[2]

Once again, plaintiff alleges only one federal cause of action against the Denisons: a First Amendment retaliation claim. It is therefore incumbent upon him to establish that there was either a U.S. Supreme Court decision or a "robust consensus" of federal appellate decisions which "clearly established" that the Denisons' alleged actions constituted unlawful First Amendment retaliation. Plaintiff has not even attempted to make such a showing in this case, and, in so doing, plaintiff has also made it clear that he simply lacks authority in support of his First Amendment retaliation claims. Moreover, the fact that he raised state, not federal law, in support of his claims strengthens this court's conclusion that this is an action which should have been filed in state, not federal court.

Plaintiff cites the U.S. Supreme Court's decision in *Hope v. Pelzer,* 536 U.S. 730 (2002) for the proposition that state law may give a plaintiff "fair warning" that his conduct is unlawful, even in the absence of federal appellate precedent. While the court understands the point plaintiff is trying to make in citing *Hope*, the decision is very different from the one here. In *Hope*, the Supreme Court considered an Eighth Amendment claim in a case where prison guards handcuffed a prisoner to a hitching post on two occasions, one of which lasted for seven hours without regular water or bathroom breaks. Among other facts, the Supreme Court noted that

---

[2]      Making this issue even more clear, plaintiff seeks to assert his First Amendment retaliation claim pursuant to 42 U.S.C. § 1983, and this statute exists to vindicate federal, not state law. Indeed, § 1983 exists primarily to vindicate the provision of the U.S. Constitution, and, while the U.S. Supreme Court held in *Maine v. Thiboutot,* 448 U.S. 1 (1980) that § 1983 may be utilized to enforce certain *federal* statutory provisions, it has never held that § 1983 may be used to enforce state statutory provisions. The court notes that *Thibotot*'s endorsement of the use of § 1983 to enforce federal statutory law has been sharply limited by subsequent decisions, *see, e.g. Gonzaga Univ. v. Doe,* 536 U.S. 273 (2002), so much so that it is exceedingly rare for § 1983 to be used to vindicate anything other than the provisions of the U.S. Constitution.

"[a]t one point, a guard taunted him about his thirst." *Hope,* 536 U.S. at 738. Faced with these

facts, six Supreme Court Justices concluded that the Eleventh Circuit erred in concluding that the

defense of qualified immunity was available to the defendants. In so concluding, the Court

observed that "[a]s the facts are alleged by Hope, the Eighth Amendment violations [are]

obvious." *Id.*

In subsequent decisions, the Supreme Court has explained *Hope* as standing for the

proposition that a failure to cite federal appellate authority supporting a claim may be excused in

cases where the constitutional violation is "obvious." In the 2004 decision of *Brosseau v.*

*Haugen,* for example, the Supreme Court wrote that:

> Of course, in an obvious case, these standards can "clearly establish" the answer,
> even without a body of relevant case law. *See Hope v. Pelzer*, 536 U.S. 730, 738,
> 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (noting in a case where the Eighth
> Amendment violation was "obvious" that there need not be a materially similar
> case for the right to be clearly established). . . . The present case is far from the
> obvious one where [generalized Fourth Amendment standards] alone offer a basis
> for decision.

*Brosseau v. Haugen,* 543 U.S. 194, 199 (2004).

After concluding in *Brosseau* that the case at bar did not involve an "obvious"

constitutional violation such as in *Hope*, the Supreme Court proceeded to consider whether

federal appellate authority in that case served to clearly establish the federal law in question.

*Brosseau,* 543 U.S. at 200. The Supreme Court concluded that the federal appellate authority in

question did not clearly establish that the conduct at issue in that case (firing at a dangerous

suspect fleeing in a high speed chase) violated the Fourth Amendment and accordingly upheld

the defendant's qualified immunity defense. *Id.* at 201.

The Supreme Court's analysis in *Brosseau* is quite typical of its recent qualified

immunity decisions. Indeed, the fact that the Supreme Court has repeatedly required that such federal authority be provided in qualified immunity decisions since *Hope* illustrates that "obvious" cases requiring no such authority are rare indeed. *See, e.g. Ashcroft v. Al-Kidd*, 131 S. Ct. 2074 (2011); *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). As noted previously, the most recent Supreme Court decisions appear to even be "upping the ante" in this regard by requiring either a decision of that Court or a "robust consensus" of federal appellate decisions in order to "clearly establish" the federal law in question. *Taylor*, 135 S. Ct. at 2044; *Sheehan*, 135 S. Ct. at 1778.

Under these circumstances, plaintiff's reliance upon *Hope* to excuse the fact that he offers only state law authority is not well taken. First and most importantly, this is not a case where a First Amendment violation is "obvious," indeed, this court has concluded that no such violation occurred at all. In *Hope*, taunting prison guards tied a prisoner to a post with no water or bathroom breaks. Under those circumstance, it was quite obvious that such sadistic conduct violated the Eighth Amendment's prohibition on cruel and unusual punishment, even in the absence of precedent dealing with that specific form of sadism. Plaintiff emphasizes that, in buttressing its conclusion in this regard, the Supreme Court in *Hope* cited Alabama state penal regulations which arguably prohibited the conduct in question. *Hope,* 536 U.S. at 738. Once again, however, the Supreme Court concluded that an Eighth Amendment violation was obvious from the plaintiff's allegations alone, and it merely used state authority to buttress that conclusion.

Plaintiff also cites the U.S. Supreme Court's decision in *Safford Unified School Dist. # 1 v. Redding*, 557 U.S. 364, 377 (2009), for the proposition that "[t]he unconstitutionality of

outrageous conduct obviously will be unconstitutional."  Much like *Hope*, however, *Safford* is clearly distinguishable from this case.  The Supreme Court described the issue in *Safford* as being "whether a 13–year–old student's Fourth Amendment right was violated when she was subjected to a search of her bra and underpants by school officials acting on reasonable suspicion that she had brought forbidden prescription and over-the-counter drugs to school."  *Safford*, 557 U.S. at 368.

In the court's view, just as *Hope* was obviously an Eighth Amendment cruel and unusual punishment case, *Safford* was obviously a Fourth Amendment unreasonable search case.[3]  In relying upon these decisions, plaintiff fails to acknowledge that there is no similarly obvious connection between the allegations in this case and the First Amendment.  That being the case, the *Hope* exception is inapplicable, and it was incumbent upon plaintiff to provide this court with federal appellate court authority clearly establishing that defendants' alleged conduct violated the First Amendment.  Plaintiff may not simply rely upon unrelated state statutes or cries of "outrageousness" to excuse his failure in this regard.  It strikes this court that, by failing to establish some initial connection between defendants' conduct in this case and the First Amendment, plaintiff is asking this court for nothing less than a recognition of the free-standing constitutional tort of outrageousness.  Indeed, if plaintiff is not required to provide this court with authority establishing that the facts of this case implicate the First Amendment, then one might wonder why he could not have just as easily chosen some other constitutional amendment as the basis for his claim.  Taking plaintiff's argument to its logical conclusion, so long as the

---

[3]     Moreover, the court notes that the hallmark of the Fourth Amendment inquiry is a determination of "reasonableness."  As such, any "outrageous" conduct by a defendant in conducting a search would seemingly be, almost by definition, unreasonable as well.

defendant's conduct can be said to have been "outrageous," then no authority establishing a connection to the constitutional provision upon which he relies would be required. This is clearly not the law.

As noted previously, plaintiff relies upon state statutes which prohibit, *inter alia*, "retaliation for anything lawfully done in the capacity of public servant," *see* § 97-9-127(1), or "obstruct[ing] or imped[ing] the administration of justice in any court." *See* § 97-9-55. In the court's view, this state law authority may well buttress plaintiff's state law claim that his termination was in violation of Mississippi public policy. However, this authority by no means buttresses his claim that his termination violated the First Amendment to the U.S. Constitution. The state statutes upon which plaintiff relies say nothing about free speech or any other First Amendment concerns, and, at any rate, it is federal appellate courts, and not the Mississippi legislature, which define the scope of the First Amendment to the U.S. Constitution.

In light of the foregoing, the court concludes that plaintiff has no valid First Amendment retaliation claim in this case, and this conclusion necessarily requires the dismissal of that claim against all defendants. Having addressed plaintiff's First Amendment claim on its merits, the court will now briefly address certain additional issues raised by the parties in their briefing.

**II. Do various procedural and preclusion defenses raised by defendants constitute additional bases for dismissing this case?**

This case involves an unusually large number of what may be regarded as "side issues," through which defendants seek dismissal of plaintiffs' claim based on procedural issues,

preclusion doctrines or alleged perjury on the part of plaintiff. These issues have occupied a large part of the parties' time and briefing, and this court has considered their arguments on these issues carefully. Unfortunately, however, the court concludes that none of these side issues offer a clear path forward in this case, given that they involve unsettled issues of law and/or require a discretionary ruling from this court rather than an analysis of the clear legal standards which the court prefers. The court concludes that, unlike the "side issues," plaintiff's central First Amendment retaliation claims do, in fact, offer clear legal standards, and it seems clear to this court that plaintiff is unable to meet those standards in this case. Accordingly, this court has based its ruling on the First Amendment issues, but it will briefly discuss the side issues, since they will become relevant should the Fifth Circuit disagree with this court's previously stated conclusions.

The first side issue raised by defendants involves their efforts to bar plaintiff from contesting the finding of the Mississippi Department of Employment Security (MDES), in denying him unemployment benefits, that he was fired for engaging in wrongdoing, namely reading his co-worker's e-mails. The U.S. Supreme Court has established a general rule that "when a state agency acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *See U. of Tenn. V. Elliot*, 478 U.S. 788, 799 (1986) (internal quotation marks, alteration, and citation omitted). The Supreme Court has established an exception to this general rule for cases where Congress has provided for a detailed administrative remedy such as that found in the Age Discrimination in Employment Act (ADEA), *see Astoria Fed. Sav. & Loan Ass'n v.*

*Solimino,* 501 U.S. 104, 110–14, 111 S. Ct. 2166 (1991), but defendants correctly note that no such administrative remedy applies to plaintiff's First Amendment retaliation claims. Defendants further note that Mississippi state courts give preclusive effect to MDES decisions, although they do appear to require some indication that there were facts supporting the agency's decision. *See, e.g., Raiola v. Chevron U.S.A., Inc.*, 872 So. 2d 79, 84 (Miss. Ct. App. 2004).

Ultimately, however, this court finds the MDES preclusion issue to present a poor basis for deciding this case, since the Fifth Circuit has specifically reserved judgment on the issue of whether collateral estoppel applies to cases where, as here, a plaintiff proceeds under a "mixed motive option."  In *Cox v. Desoto Cty., Miss.*, 564 F. 3d 745, 748-49 (5th Cir. 2009), the Fifth Circuit declined to decide this issue, since it found that the plaintiff in that case had not raised mixed-motive arguments before the district court.  *Id.*  In this case, by contrast, plaintiff has clearly asserted the mixed motive option as to his First Amendment retaliation claim, and, as noted previously, the U.S. Supreme Court's decision in *Mt. Healthy* gives him the right to do so. In light of the foregoing, it is simply unclear whether collateral estoppel applies to the MDES' findings in this case, and this court therefore declines to decide this issue based on little more than an educated guess regarding the applicable standards.

This court also finds a considerable lack of legal clarity as to the side issues arising from defendant's contention that plaintiff committed perjury in his deposition when he falsely asserted that he was certified as a full-time police officer.  Defendants give their arguments on this issue very extensive weight in their briefing, setting forth in detail plaintiff's alleged dishonesty in this regard.  From this court's review of the record, there does appear to be strong evidence suggesting that plaintiff engaged in a deliberate deception regarding his certification.  Indeed, it

appears to be undisputed that plaintiff enrolled in the Mississippi Law Enforcement Officer Training Academy in an attempt to gain his full-time certification in 2004 but that he was dismissed after he could not do the requisite number of push-ups. It further seems clear that plaintiff attempted to give a false impression that he was certified, both in his employment application and in his deposition in this case.

Defendants argue that this court should find that plaintiff committed perjury on this issue and dismiss the case with prejudice on this basis. It is well established that "[t]he authority to sanction a party for committing perjury is derived from the inherent power to prevent fraud from being perpetrated upon the court." *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). The Fifth Circuit has stated that dismissal with prejudice is an appropriate sanction when "'a clear record of delay or contumacious conduct by the plaintiff[]'" exists and when "'lesser sanctions would not serve the best interests of justice.'" *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 77 (5th Cir. 2011). In the court's view, while there may well be a "clear record of delay or contumacious conduct by the plaintiff'" on this issue, it is less clear whether some lesser sanction, such as a harshly worded jury instruction, would suffice in this regard. Once again, this court prefers to decide cases based upon clear principles of law rather than somewhat murky discretionary doctrines, and it therefore regards this as being a less-than-ideal basis to decide this case. At any rate, it is clearly unnecessary to decide whether plaintiff's dishonesty should bar his claims, since this court has found that his First Amendment claim lacks merit regardless. The court therefore will make no findings on this issue.

In a related argument, defendant contends that plaintiff's lack of certification should be considered against him in determining the factual merits of his First Amendment retaliation

claim.  In response, plaintiff argues that any such evidence of lack of certification should be considered, at most, as after-acquired evidence limiting his damages under the Supreme Court's decision in  *McKennon v. Nashville Banner Pub'l Co.*, 513 U.S. 352, 362 (1995).  In their brief, defendants argue that "Boisseau's retaliation claim is a nonstarter because he was never qualified to serve as Walls' police chief."  Based upon the parties' briefing, however, defendants do not appear to have any binding authority in support of applying a "qualification" requirement to a First Amendment retaliation claim, although they do cite authority suggesting that the Fifth Circuit might adopt such a holding in an appropriate case.

Defendants cite *Fullen v. Galveston Indep. Sch. Dist.*, 564 F. Supp. 2d 719, 733-34 (S.D. Tex. 2008) for the proposition that a qualification requirement exists in this context, but *Fullen* involved a Title VII retaliation claim, not a First Amendment retaliation claim.  Defendants also rely upon a footnote in the Fifth Circuit's decision in *Charles v. Grief*, 522 F.3d 508, 510 n.2 (5th Cir.  2008) for the same proposition, but the elements of a First Amendment retaliation claim quoted in that footnote include no mention of any qualification requirement.  Defendants thus fail to offer this court any authority in support of their argument on this issue.  It appears to this court that the most defendants can offer in this context is an argument that the Fifth Circuit *would* extend a qualification requirement to First Amendment retaliation claims in an appropriate case, since it has applied such a requirement to Title VII, ADEA and ERISA retaliation claims. Indeed, in deciding to extend the qualification requirement to ADEA retaliation claims, the Fifth Circuit wrote in *Holtzclaw v. DSC Communications Corp.* that:

> [w]e have never expressly made qualification a prima facie element of an ADEA retaliation claim, but today we decide that such an element is necessary. Retaliation claims are nothing more than a protection against discrimination in that the employee against whom the employer has retaliated suffers

discrimination based on the employee's exercise of a right to charge, testify, assist, or participate in a protected activity under the ADEA. *See* 29 U.S.C. § 623(d). Because, in regard to other types of discrimination claims, including other ADEA claims, we consistently have required that a plaintiff be qualified for the job he seeks, it would be illogical not to require one here.

255 F.3d 254, 260 (5th Cir. 2001).

In the court's view, this rather broadly-worded language in *Holtzclaw* provides defendants with a reasonable argument that the Fifth Circuit *would* extend the qualification requirement to First Amendment retaliation claims in an appropriate case. At this juncture, however, this argument appears to be just that: an argument, and not the sort of binding precedent upon which this court prefers to base its summary judgment rulings. The court therefore does not regard this issue as constituting a proper basis for dismissing plaintiff's First Amendment retaliation claim.

Having said that, this court does find, as a factual matter, that defendants have presented strong evidence in their briefing and attached submissions that, contrary to his representations, plaintiff did not obtain full-time certification for the position he held. As noted by defendants:

> Although Boisseau testified at his deposition that he is full-time certified, and even that he physically possessed and could produce his certification, the evidentiary record conclusively proves otherwise. Boisseau did not produce the alleged certification in response to post-deposition written discovery because, as confirmed by the Director of Mississippi's Board of Standards and Training, Boisseau has never held a full-time certification. To be sure, Boisseau knows very well that he has never been full-time certified. He entered a full-time academy in 2004 in an attempt to obtain the certification but could not complete the physical fitness requirements, he also sought to dupe the Board of Standards and Training since he did not have a full-time certification by representing that he only worked at Walls part-time when, in reality, he worked full-time, and he even went so far as to steal another officer's full-time certification number and use it as his own in a form submitted to the Mississippi Highway Patrol.

In his briefing, plaintiff merely notes his deposition testimony regarding his alleged belief that he

had obtained full-time certification based on his "street training." No actual proof substantiating this professed belief has been submitted, however, and it therefore appears that plaintiff has been caught in a sustained deception on this issue.

In light of the foregoing, this court agrees with defendants that plaintiff lacks the basic certification qualification for the job at issue in this case. As such, if this court were to conclude that the rationale set forth in *Holtzclaw* applied equally to First Amendment retaliation claims, then it would find plaintiff's claim to be meritless on this additional basis. This court does not regard it as being the proper province of a district court to purport to extend the law in such a manner, however, since this is a role properly performed by appellate courts. Of course, defendants may argue for the extension of *Holtzclaw*'s rationale to First Amendment retaliation claims on appeal, but this court does not regard this as being a proper basis for the grant of summary judgment based upon current law. The court therefore does not regard any of the "side issues" in this case to present a strong basis for deciding this case, though its discussion of their arguments in this context will hopefully help to frame any appellate arguments in this regard.

**Conclusion**

For the reasons previously stated, the court concludes that plaintiff's First Amendment retaliation claim lacks merit because 1) he was not terminated on the basis of any protected speech in this case; and 2) even assuming that his conduct did constitute protected speech, it was clearly within the scope of his duties as police chief and thus enjoyed no First Amendment protection under *Garcetti*. The court therefore concludes that plaintiff's First Amendment retaliation claim is without merit and is due to be dismissed.

At this juncture, the sole remaining claims before the court are plaintiff's state law claims, including his claim that his termination by the City was in violation of Mississippi public policy. In a case such as this one, where all federal claims are dismissed prior to trial, 28 U.S.C. § 1367(c)(3) gives this court discretion to decline to exercise supplemental jurisdiction over the remaining state law claims. Indeed, the Fifth Circuit has noted that the "general rule favor(s) dismissal of state claims when the federal claims to which they are pendent are dismissed," *see Guzzino v. Felterman*, 191 F.3d 588, 595 (5th Cir.1999), and the court concludes that it should follow the general rule in this case. In so concluding, the court places significant weight upon the fact that Mississippi state courts have a strong interest in determining whether and under what circumstances the municipalities and officers of this state should be held liable under state law for allegations such as those in this case, particularly since these issues implicate the public coffers.

This interest is particularly strong in this case, since Mississippi state courts clearly have a strong interest in defining what is and is not against public policy under state law. Mississippi courts also have much greater experience in applying that state law, and only the Mississippi Supreme Court has the authority to make new law in this context, thus greatly increasing its flexibility to deal with novel issues of law, with no need for *Erie* guesses or the time-consuming certification process. Based on the parties' briefing, this court can discern a number of difficult state law issues which may arise in this case, including the applicability of the discretionary functions exception of the Mississippi Tort Claims Act to the facts of this case.[4] In light of the

---

[4]The court notes that the Mississippi Supreme Court's jurisprudence regarding this exception has been in considerable flux in recent years, *see, e.g. Little v. MDOT*, 129 So. 3d 132 (Miss. 2013), and it seems clear that state courts are in a far better position to clarify whether it applies to facts

foregoing, the court will decline to exercise supplemental jurisdiction over plaintiff's state law claims and dismiss those claims without prejudice. The court notes that § 1367(d) provides for the tolling of any relevant statutes of limitations applicable to state law claims during the pendency of this action and for thirty days after their dismissal. Plaintiff should therefore be cognizant of this tolling provision if he wishes to preserve his state law remedies in this regard.

It is therefore ordered that defendants' motions for summary judgment are granted in part, as to plaintiff's federal claims, and this court declines to exercise supplemental jurisdiction over the remaining state law claims. Plaintiff's federal claim will therefore be dismissed with prejudice, and his state law claims will be dismissed without prejudice.

A separate judgment will be entered this date, pursuant to Fed. R. Civ. P. 58.

So ordered, this, the 8th day of October, 2015

**/s/ MICHAEL P. MILLS**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**

such as these.